UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BAIS YAAKOV OF SPRING VALLEY, on
behalf of itself and all others similarly
situated,

                                        Plaintiff,

          v.

EDUCATIONAL TESTING SERVICE,

                                        Defendant.

No. 13-CV-4577 (KMK)

OPINION & ORDER

Appearances:

Aytan Y. Bellin, Esq.
Erik L. Shawn, Esq.
Bellin & Associates
White Plains, NY
*Counsel for Plaintiff*

Roger Furman, Esq.
Los Angeles, CA
*Counsel for Plaintiff*

Robert W. Gaffey, Esq.
Andrew S. Kleinfeld, Esq.
Brandy H. Ranjan, Esq.
J. Todd Kennard, Esq.
Michael M. Klotz, Esq.
Sharyl A. Reisman, Esq.
Jones Day
New York, NY
Columbus, OH
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

     Plaintiff Bais Yaakov of Spring Valley ("Plaintiff" or "Bais Yaakov") brings this class

action suit against Defendant Educational Testing Service ("Defendant" or "ETS"), alleging that

ETS caused over 17,000 unsolicited and solicited fax advertisements for goods and services to be sent out without the proper opt-out notices, in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, and N.Y. General Business Law ("GBL") § 396-aa. (*See* Second Am. Compl. ("SAC") (Dkt. No. 79).) Before the Court is Defendant's Motion for Summary Judgment. (Not. of Mot. (Dkt. No. 247).) For the following reasons, Defendant's Motion is granted in part and denied in part.

## I. Background

### A. Factual Background

The Court has described the allegations and procedural history of this case in a prior published Opinion. *See Bais Yaakov of Spring Valley v. ETS*, 251 F. Supp. 3d 724 (S.D.N.Y. 2017). The Court therefore assumes familiarity with the dispute and will provide factual and procedural background only as relevant to the instant Motion.

The following facts are taken from the Parties' statements pursuant to Local Civil Rule 56.1, specifically Defendant's 56.1 Statement (Def.'s Rule 56.1 Statement ("Def.'s 56.1") (Dkt. No. 249)), Plaintiff's 56.1 Response and Counterstatement (Pl.'s Rule 56.1 Response and Counterstatement ("Pl.'s 56.1") ("Pl.'s 56.1 Counter") (Dkt. No. 269)), and Defendant's Counterstatement (Def.'s Rule 56.1 Counterstatement ("Def.'s 56.1 Counter") (Dkt. No. 276)), and the admissible evidence submitted by the Parties.[1] The facts are recounted "in the light most favorable to" Plaintiff, the non-movant. *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d

---

[1] Plaintiff submitted one document containing both its 56.1 Response and 56.1 Counterstatement at Dkt. No. 269. To avoid confusion with respect to paragraph numbering, the Court references Plaintiff's Response and Counterstatement separately.

Cir. 2018) (citation and quotation marks omitted).  The facts as described below are in dispute only to the extent indicated.[2]

## 1.  The Distribution Agreement

Bais Yaakov is a religious corporation and a high school.  (Decl. of David Sussman ("Sussman Decl.") ¶ 1 (Dkt. No. 65).)  ETS is a non-profit corporation known for its role in administering the SAT, PSAT, and AP exams.  (Def.'s 56.1 ¶ 1.)  ETS owns the rights to various educational products and services, including Criterion, which is a web-based application that evaluates a student's writing skills and provides diagnostic feedback and a holistic score.  (*Id.* ¶ 2.)

In 2008, ETS entered into an exclusive distribution agreement ("Distribution Agreement") with Houghton Mifflin Harcourt Publishing Company ("HMH"), pursuant to which

---

[2] Where the Parties identify disputed facts but with semantic objections only or by asserting irrelevant facts, which do not actually challenge the factual substance described in the relevant paragraphs, the Court will not consider them as creating disputes of fact.  *See Baity*, 51 F. Supp. 3d at 418 ("Many of [the] [p]laintiff's purported denials—and a number of [its] admissions—improperly interject arguments and/or immaterial facts in response to facts asserted by [the] [d]efendant[], often speaking past [the] [d]efendant[]' asserted facts without specifically controverting those same facts. . . .  [A] number of [the] [p]laintiff['s] purported denials quibble with [the] [d]efendant['s] phraseology, but do not address the factual substance asserted by [the] [d]efendant[]."); *Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, No. 07-CV-8828, 2013 WL 3929630, at *1 n.2 (S.D.N.Y. July 30, 2013) (explaining that the plaintiff's 56.1 statement violated the rule because it "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the] [d]efendant, without specifically controverting those facts," and "[i]n other instances, . . . neither admits nor denies a particular fact, but instead responds with equivocal statements"); *Goldstick v. The Hartford, Inc.*, No. 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (noting that the plaintiff's 56.1 statement "does not comply with the rule" because "it adds argumentative and often lengthy narrative in almost every case[,] the object of which is to 'spin' the impact of the admissions [the] plaintiff has been compelled to make").

Where possible, the Court has relied on the undisputed facts in the Parties' 56.1 submissions.  However, direct citations to the record have also been used where relevant facts were not included in any of the Parties' Rule 56.1 submissions, or where the Parties did not accurately characterize the record.

HMH obtained the exclusive right to distribute, market, and advertise Criterion in the K-12 school market in the United States.  (*Id*. ¶ 4.)  ETS and HMH signed the Distribution Agreement on June 25, 2008, and that initial contract spanned the time period of June 25, 2008 to December 31, 2011.  (*Id*. ¶ 5.)  The Distribution Agreement was extended through December 31, 2012 by amendment dated December 30, 2011.  (*Id*. ¶ 6.)  This Distribution Agreement was operative on November 15, 2012 when the fax at issue in this litigation (the "HMH Fax" or "Fax") was sent. (*Id*. ¶ 7.)

Pursuant to the Distribution Agreement, ETS agreed not to sell Criterion in the K-12 school market in the United States—only HMH could do so.  (*Id*. ¶ 8.)  HMH agreed to "comply with any and all applicable laws, regulations and other rules in the performance of its obligations under this agreement, including regulations relating to the marketing of the service."  This included the TCPA.  (*Id*. ¶ 9.)  ETS did not itself advertise or market its Criterion Service to the K-12 market in the United States.  Instead, ETS relied solely on HMH to do so.  (Pl.'s 56.1 Counter ¶ 4.)  The Distribution Agreement granted HMH the exclusive right to market Criterion. (Def.'s 56.1 ¶ 12.)  HMH was also solely responsible for signing up new customers for ETS's Criterion Service, and for sending to ETS completed and signed subscriber agreements, which enabled ETS to activate new customers' accounts.  (Pl.'s 56.1 Counter ¶ 7.)  The Distribution Agreement did not address HMH undertaking any specific forms of marketing, and it made no mention of marketing by facsimile (or "fax").  (Def.'s 56.1 ¶ 13.)  The Distribution Agreement provided that HMH would "use commercially reasonable efforts to promote the use and sale of Criterion," (Decl. of Andrew S. Kleinfeld, Esq. ("Kleinfeld Decl.") Ex. E, at § 5.1 (Distribution Agreement between ETS and HMH ("Distribution Agreement")) (Dkt. No. 250-5)), and

"establish the marketing strategy . . . [and] develop and distribute marketing and promotional materials," (*id*. §§ 5.1(i)–(ii)).

The Distribution Agreement provided that HMH would "only make such representations about [Criterion] as have been expressly approved, in writing and in advance, by ETS, or which are contained in other materials provided by ETS," (Distribution Agreement § 5.1(viii)), and "provide ETS with all new messaging to ensure it does not make product claims not supported by ETS research," (*id.* § 5.1(ix)).  ETS in turn agreed to "us[e] reasonable efforts to review all new messaging submitted by [HMH]."  (*Id*. § 4.1(vii).)[3]  The Distribution Agreement also provided that ETS had to approve of HMH's use of ETS logos.  (*Id*. § 3.1.2.)[4]  The Distribution Agreement provided that "[t]he relationship between ETS and Distributor shall be that of independent contractors.  Nothing contained in this Agreement shall be construed to create a partnership, joint venture, or agency relationship between the parties, and, notwithstanding anything else herein, neither party shall have the right to incur . . . any obligation or liability on behalf of the other party."  (*Id*. § 15.4).)[5]

---

[3] Defendant inaccurately states that "[t]he Distribution Agreement contained no provision allowing ETS to approve or reject the marketing plans developed by HMH."  (Def.'s 56.1 ¶ 15.)  The Distribution Agreement did not expressly provide for review of HMH's "marketing plans," but it clearly provided for review of marketing materials by ETS.  (*See* Distribution Agreement §§ 4.1(vii), 5.1(viii)–(ix).)

[4] Defendant inaccurately states that "the only approval rights retained by ETS involved protections for ETS's trademarks, in the event HMH used them in marketing Criterion, and HMH's description of the Criterion service."  (Def.'s 56.1 ¶ 17 (citing Distribution Agreement §§ 3.1.2, 3.1.3, 5.1(viii)).)  Defendant correctly cites provisions of the Agreement that indeed give ETS approval rights over HMH's use of its logos and trademarks.  However, these were not the only approval rights ETS retained.  As Defendant itself points out, ETS also retained approval rights over ETS's representations and statements about Criterion.  (Def.'s 56.1 ¶ 21 (citing Distribution Agreement §§ 5.1(viii)–(ix)).

[5] Defendant points to § 15.4 to state that the Distribution Agreement did not create an agency relationship, a joint venture, or partnership, between HMH and ETS.  (Def.'s 56.1 ¶¶ 10–

2.  The HMH Fax Campaign

In or about November 2012, HMH decided to market the Criterion product by facsimile through Riverside Publishing Inc. ("Riverside Publishing"), a division of HMH.  (Kleinfeld Decl. Ex. G, at 33–36, 102–104 (Deposition Testimony of Idy Spezzano ("Spezzano Dep."); Decl. of Aytan Y. Bellin, Esq. ("Bellin Decl.") Ex. A, at 39 (Deposition Testimony of Susan Yetman ("Yetman Dep.") (Dkt. No. 265-1).)[6]  HMH conceived of, designed, and physically drafted the HMH Fax. (Def.'s 56.1 ¶ 21.)

On November 7, 2012, ETS learned that HMH intended to market Criterion by fax, when Laurel Kaczor ("Kaczor"), of HMH, emailed Susan Yetman ("Yetman"), a Criterion account manager at ETS.[7]  (*Id.* ¶ 31.)  In her November 7, 2012 email, Kaczor asked Yetman whether she had a few minutes to review the Criterion Fax, explaining that "Riverside publishing is planning on conducting a fax campaign for 10 states within the next day or so."  (Kleinfeld Decl. Ex. M, (Nov. 7 to Nov. 9, 2012 Email Exchange between Kaczor and Yetman ("Nov. 7–9 Kaczor-Yetman Emails").)[8]  On November 7, 2012, Yetman forwarded Kaczor's email to Bob Haller

---

11.)  Plaintiff counters that regardless of how the Distribution Agreement characterized the relationship between HMH and ETS, whether HMH was an agent of ETS, or in a partnership or joint venture with ETS, when it engaged in the Criterion fax campaign, is a question of law. (Pl.'s 56.1 ¶¶ 10–11.)  The Court here describes the provisions of the Distribution Agreement as factual background and *does not*, in this section, draw any legal conclusions about the nature of the relationship between HMH and ETS based on this description alone.

[6] Defendant inaccurately cites to Spezzano's deposition testimony to state that Riverside Publishing was a subsidiary of HMH, when she actually testified that she believed it was a division of HMH.  (*Compare* Def.'s 56.1 ¶ 20; Spezzano Dep. 32–33, 102–03.)

[7] Elsewhere, Defendant describes Kaczor as a Riverside Publishing employee.  (Def.'s 56.1 ¶ 45.)

[8] Defendant characterizes this communication as not providing ETS "with any information regarding potential recipients of the HMH Fax."  (Def.'s 56.1 ¶ 26.)  Plaintiff points out that HMH did inform ETS that it would send the fax to schools in 10 states.  (Pl.'s 56.1 ¶ 26.)

("Haller"), a content specialist at ETS, and asked him to review the attached fax and let her know whether there were any "show stoppers." (Kleinfeld Decl. Ex. O (Nov. 7, 2012 Kaczor Email to Haller ("Nov. 7 Kaczor-Haller Email")).) Yetman noted that the fax "[l]ook[ed] ok to [her]" and that she was not sure "what kind of return [HMH could] get on a fax campaign, but that's an HMH decision." (*Id.*) She also noted that "there should be a footer with the ETS standard trademark language." (*Id.*) On November 9, 2012, Yetman asked Kaczor whether she had had heard from Haller. When Kaczor replied that she had not, Yetman indicated she would follow up with Haller. (Nov. 7–9 Kaczor-Yetman Emails.) On November 12, 2012, Yetman followed up with Haller, who replied, "[l]ooks perfect. Nice way of putting the relationship to CCSS without claiming more than we actually do." (Kleinfeld Decl. Ex. P (Nov. 12, 2012 Yetman Email to Haller ("Nov. 12 Yetman-Haller Email")).) On November 12, 2012, Yetman wrote to Kaczor that Haller had approved the fax, and conveyed Haller's comment to Kaczor. (Kleinfeld Decl. Ex. N (Nov. 7 to Nov. 12, 2012 Email Exchange between Kaczor and Yetman ("Nov. 7–12 Kaczor-Yetman Emails")).)[9]

ETS made no other comment, internally or externally, on the opt-out language of the HMH Fax. (Def.'s 56.1 ¶ 34.)[10] There were a total of five emails between ETS and HMH,

---

[9] The Court cites directly to the record because the Parties disagree almost entirely about the proper characterization of communications between ETS and HMH. (*See* Def.'s 56.1 ¶¶ 32–33, 35–36; Pl.s' 56.1 ¶¶ 32–33, 35–36.) Defendant inaccurately stated in its 56.1 that "HMH asked ETS to approve its use of ETS's logo and to verify that the description of Criterion in the HMH Fax was accurate." (Def.'s 56.1 ¶ 32). Defendant also inaccurately represented that "HMH did not ask ETS to review the opt-out language on the HMH Fax." (Def.'s 56.1 ¶ 35.) Nothing in the email exchange between Kaczor and Yetman indicates ETS's review was limited only to the use of the logo and the description of the product, and not the opt-out language. (*See* Nov. 7–12 Kaczor-Yetman Emails; Nov. 7–9 Kaczor-Yetman Emails.)

[10] The Parties dispute whether ETS's review of the HMH Fax constituted a "role in drafting" the Fax. Defendant states that "ETS had no role in drafting any part of the HMH Fax, nor did ETS request that HMH draft the HMH Fax." (Def.'s 56.1 ¶ 22.) Plaintiff disputes this

specifically between Yetman and Kaczor, regarding the HMH Fax, and no other written or oral communications between these entities regarding the HMH Fax. (*Id.* ¶ 37.) ETS's only internal communications concerning the HMH Fax consisted of five emails between two ETS employees, specifically Yetman and Haller, about the description of Criterion. (*Id.* ¶ 38.)

Yetman testified that HMH "would not have been able to send the document in the form that it was in when it was reviewed if it was not correct as to its representation of Criterion," and that if Haller had not approved it, HMH would have had to revise it. (Yetman Dep. 49.) Idy Spezzano ("Spezzano"), an HMH employee, supervised the creation of the HMH Fax, and wrote and edited the advertisement with other HMH employees, including Kaczor. (Spezzano Dep. 33–36.) Spezzano offered conflicting testimony regarding her understanding of whether HMH needed ETS's approval. She testified that even if ETS had told HMH that they did not want it to do the fax campaign, "[HMH] would have done it anyway." (Spezzano Dep. 367–68.) When asked if HMH would have proceeded with the fax campaign even if ETS said "we absolutely forbid it," Spezzano replied, "[i]t's in the contract that HMH was responsible for marketing. ETS had no role in that." (*Id.* at 368.) Spezzano conceded, however, that if ETS had not approved of the language of the Criterion fax, and the use of their logo, HMH could not have been "able to market." (*Id.* at 369.)

In preparing its fax campaign for its sending of the HMH Fax, HMH executed a data license agreement with Market Data Retrieval ("MDR") pursuant to which HMH obtained a list

---

characterization, pointing out that ETS knew HMH was going to send out a fax advertisement promoting the Criterion System to schools in 10 states, and ETS reviewed and approved the Criterion Fax. (Pl.'s 56.1 ¶ 22.) Semantics aside, what is clear from the email exchanges between Yetman, Kaczor, and Haller, and Kaczor and Spezzano's testimony, is that ETS reviewed and approved the contents of the HMH fax, although it did not provide any substantive feedback or require that any changes be made to the fax.

of recipient names and associated fax numbers.  (Def.'s 56.1 ¶ 23.)  ETS did not pay any money to MDR in connection with HMH's data license agreement with MDR.  (*Id*. ¶ 24.)  ETS was not involved with HMH's relationship with MDR in connection with the HMH Fax or the HMH fax campaign, nor did ETS have any knowledge of this relationship.  (*Id*. ¶ 25.)

HMH contracted with WestFax to send the HMH Fax to the intended recipients.  (*Id*. ¶ 28.)  ETS did not participate in the HMH-WestFax engagement or pay any money to WestFax in connection with that engagement.  (*Id*. ¶ 29.)  ETS had no interaction with WestFax regarding the HMH Fax or the HMH fax campaign.  (*Id*. ¶ 30.)

Kaczor, who had previously provided Spezzano a list of states to which Kaczor recommended the Criterion Fax be sent, reported ETS's response to HMH's Spezzano by e-mail.  (Pl.'s Counter ¶ 22.)  Spezzano had Debbie Pangilinan, another HMH employee, retrieve the fax numbers of the K-12 schools in those 10 states from HMH's "Sales Force" database, which contained that information.  (*Id.* ¶ 23.)  The final fax list was reduced to the fax numbers of the K-12 schools from seven of those 10 states, and contained more than 22,000 entries.  (*Id*. ¶ 24.)  Melissa Pearson, an HMH employee, uploaded the Criterion Fax and the Criterion Fax list to the website of WestFax with instructions to transmit the Criterion Fax on November 15, 2012.  (*Id*.)

On November 15, 2012, WestFax successfully transmitted the Criterion Fax to 17,710 fax numbers on the fax list.  (*Id*. ¶ 25.)  WestFax provided HMH a specific list of the fax numbers to which WestFax did not attempt to transmit or did not successfully transmit the Criterion fax.  (*Id*. ¶ 26.)

Other than Yetman and Haller, no one at ETS was aware of the HMH fax campaign until ETS was named a defendant in this lawsuit in August 2015.  (Def.'s 56.1 ¶ 39.)  Prior to this litigation, no one from ETS's marketing department was aware of or involved in the HMH fax

campaign.  (*Id.* ¶ 40.)  Prior to this litigation, no one at ETS was aware of how many entities received the HMH Fax, the names of the recipients of the HMH Fax, or where they resided. (*Id.* ¶ 41.)  HMH never informed ETS of the results of the HMH fax campaign or whether any of the fax recipients ever contacted HMH.  (*Id.* ¶ 42.)  In fact, HMH never informed ETS that the HMH Fax was sent.  (*Id.* ¶ 43.)

### 3.  Language of the HMH Fax

The text of the HMH fax reads:

> How do you know if the school programs you spend money on really work?  Would you be interested in a writing program that could prove you've made a difference in your district?  The Criterion Online Writing Evaluation service for grades 4-12 can provide you proof of your district's progress.  This web-based, comprehensive instructional tool helps students plan, write, and revise essays.

(Pl.'s 56.1 Counter ¶ 10; SAC Ex. A ("HMH Fax").)  The HMH Fax described various attributes of the service and stated that the service was "successfully used in more than 1,500 districts nationwide, with over 1 million subscriptions sold."  (*Id.*)  The Fax referred recipients to a website for a demonstration and offered personalized online demonstrations.  At the bottom of the page, it contained a notice (the "Opt-Out Notice") that provided in full: "If you do not wish to receive faxes from Houghton Mifflin Harcourt in the future, and/or if you would prefer to receive communication via email, please contact your representative.  Upon your request, we will remove you from our fax transmissions within 30 days."  (*Id.*)  The ETS logo appears at the top of the Criterion Fax.  (*Id.*)[11]

---

[11] Defendant correctly points out that the HMH Fax does not state that it is from ETS, (Def.'s 56.1 ¶ 50), and that *the text* of the HMH Fax does not make any reference to ETS, (*id.* ¶ 51).  Plaintiff counters that "[t]he ETS logo is at the top of the Criterion Fax as part of the 'branding' of ETS's Criterion Service, which ETS desired to make sure that people associated the Criterion Service with ETS."  (Pl.'s 56.1 ¶ 51 (citing Bellin Decl. Ex. D, at 25, 33–34 (Deposition of Pamela Treves ("Treves Dep.")).)  The portions of deposition transcript cited to, however, do not support this exact proposition.  Treves testified that ETS did not do its own

The HMH Fax directed recipients to the Riverside Publishing website. (Def.'s 56.1 ¶ 44; HMH Fax.) The HMH Fax identified Kaczor as the person to contact for more information regarding Criterion, and provided a phone number and fax number for Kaczor. (HMH Fax.) The HMH Fax did not include contact information for ETS. (Def.'s 56.1 ¶ 50.)

HMH received communications from recipients of the HMH Fax requesting to opt out from receiving future faxes. (*Id.* ¶ 52.) ETS received no communications from HMH Fax recipients, nor was ETS even aware that HMH had received any opt-out requests. (*Id.* ¶ 53.)

Plaintiff recognized that HMH was the sender of the HMH Fax. (*Id.* ¶ 54.) In his Declaration, Rabbi David Sussman ("Sussman"), the Executive Director of Bais Yaakov, stated that "[o]n or about November 27, 2012, Plaintiff received an unsolicited fax advertisement on its fax machine . . . sent by Defendants [HMH and Laurel Kaczor]." (Sussman Decl. ¶ 3.) Sussman testified that he initially believed HMH was the sender of the fax because the language of the fax read, "'If you do not wish to receive faxes from Houghton Mifflin Harcourt in the future,' which implies that HMH sent the fax, not ETS." (Kleinfeld Decl. Ex. S, at 93 (Deposition of David Sussman ("Sussman Dep.")) Sussman further testified that ETS was added as Defendant in this case because discovery revealed that HMH had sent the fax advertisements on ETS's behalf and that ETS was working in conjunction with HMH. (Bellin Decl. Ex. E, at 55–56 (Deposition of David Sussman ("Sussman Dep.").)[12]

---

marketing, but instead used distributors to market and sell its product, so that ETS "ma[d]e its money" through royalties. HMH was the distributor responsible for marketing the Criterion product. (Treves Dep. 25–26.) Trevers testified that ETS expected HMH to do "everything they can to effectively grow the business." (*Id.* at 34.)

[12] The Parties submitted different portions of Sussman's deposition transcript as exhibits at Dkt. Nos. 250 and 265. Where the Parties include different portions of transcript, the Court will cite directly to the transcript rather than to separate exhibits.

### 4. Plaintiff's Damages

Sussman testified that he was at the Bais Yaakov offices when the fax came through. He was the first and only person to notice it. He read the fax at that time but did not give it to anyone else to read or tell anyone about it at the time. (Sussman Dep. 64–65.) Sussman testified that the fax machine on which the HMH fax was received was the only fax machine at Bais Yaakov. (*Id*. at 99.)[13] Sussman took the HMH Fax off of the fax machine and put it in a drawer that is used to store faxes before they are sent to Bais Yaakov's TCPA counsel. (Def.'s 56.1 ¶ 57.) Sussman believed it was an unsolicited fax and he was annoyed by it. (Sussman Dep. 65–66.) Sussman testified that the fax did not disrupt the teaching at the school or the work of anyone else in the office when it was received. (*Id*. at 102.) He testified that the loss of paper and toner involved in printing the fax was a "concrete loss" but that "[he] wouldn't be sitting here [in his deposition] if that was the basis of—[his] loss." (*Id*. at 103.)

Sussman testified that he knew that there were statutory damages available under the TCPA and that apart from those any loss that Plaintiff incurred was "not worth mentioning." (*Id*. at 103.) The only category of damages Plaintiff identified in response to Defendant's interrogatories, are statutory damages. (Kleinfeld Decl. Ex. T, at 3–4 (Pl.'s Reply to Def.'s Interrog.).)[14]

---

[13] The Court cites directly to the record because the Parties disagree almost entirely about the proper characterization of the harm or damages Plaintiff suffered as a result of receiving the HMH Fax. (*See* Def.'s 56.1 ¶¶ 56–61; Pl.s' 56.1 ¶¶ 56–61.)

[14] Plaintiff stated that it seeks "statutory damages under the TCPA of at least $61,985,000, or $185,955,000 if the Court finds that Defendant's [actions] . . . were willful and/or knowing," on behalf of itself and proposed class A and B, for the 17,710 copies of the fax sent by Defendant. (Pl.'s Reply to Def.'s Interrog. 3.) Plaintiff also stated that "Defendant is also liable to Plaintiff and proposed Class C for statutory damages under N.Y. Gen. Bus. L. [] §396-aa for being the sender of the Fax . . . . The amount of the statutory damages is $100 per Fax." (*Id*. at 4.)

### 5. Pre-Existing Relationship Between Plaintiff and Defendant

ETS has had a business relationship with Plaintiff dating from at least 1977, when Plaintiff sent ETS contact information so that ETS could update its mailing list "for the purpose of sending out testing program information which [ETS] believe[d] [would] be of interest to school personnel." (Def.'s 56.1 ¶ 62.) ETS's business relationship with Plaintiff was related to the school's administration of the SAT exam and other tests. (*Id*. ¶ 63.)

In the context of this established business relationship, Plaintiff voluntarily provided its fax number to ETS on March 17, 2005 as part of a form that Esther Pilchik ("Pilchik"), the school's secular principal responsible for arranging the SAT and other tests, faxed to ETS to update its contact information. (*Id*. ¶ 64.) Plaintiff admitted that by filling out the March 2005 form in which it provided ETS its fax number, Plaintiff provided ETS with permission to communicate with it. (*Id*. ¶ 65.) Pilchik has the authority to give Plaintiff's fax number to ETS. (*Id*. ¶ 66.) Sussman testified that if one of Plaintiff's two principals gave out the school's fax number, that constituted permission or an invitation to communicate by fax with Plaintiff. (*Id*. ¶ 67.)

There is no evidence that the permission Plaintiff provided to ETS to communicate by fax was ever withdrawn. (*Id*. ¶ 68.) ETS kept Plaintiff's fax number in its customer file, and ETS exchanged faxes with Plaintiff as a part of that business relationship. (*Id*. ¶ 69.) However, Plaintiff never gave prior express permission or invitation to ETS, HMH, or anyone else to send Plaintiff *fax advertisements*. (Pl.'s 56.1 ¶¶ 62, 65–68 (citing Sussman Dep. 152).)

Plaintiff made payments to ETS in connection with the purchase and sale of standardized testing services, and these payments began at least as early as November 13, 1999. (Def.'s 56.1

¶ 70.)  Plaintiff made a payment of $494 to ETS on December 28, 2012 relating to exam administration, approximately six weeks after the HMH Fax was sent.  (*Id.* ¶ 71.)

### 6.  Plaintiff's Knowledge Regarding the Opt-Out Notice

Plaintiff has initiated fourteen putative class action lawsuits under the TCPA since 2011. (Def.'s 56.1 ¶ 73.)  Sussman testified that Plaintiff has received more than $150,000 from TCPA lawsuits brought on its behalf.  (*Id.* ¶ 95.)  Plaintiff has never attempted to opt out of receiving future faxes from HMH, ETS, or any other entity since first filing a TCPA lawsuit, including following its receipt of the HMH Fax.  (*Id.* ¶ 74.)  No one at Plaintiff read the Opt-Out Notice on the HMH Fax to determine if it was possible to opt-out of receiving future faxes.  (*Id.* ¶ 76.)

Plaintiff alleges that the Opt-Out Notice on the HMH Fax violated the TCPA and regulations thereunder in six ways.  Specifically, Plaintiff alleges the Opt-Out Notice:

> A. fails to provide a facsimile number to which the recipient may transmit an opt-out request;
> B. fails to provide a domestic contact telephone number to which the recipient may transmit an opt-out request;
> C. fails to provide a cost-free mechanism to which the recipient may transmit an opt out request;
> D. fails to state that a recipient's request to opt out of future fax advertising will be effective only if the request identifies the telephone number(s) of the recipient's telephone facsimile machine(s) to which the request relates;
> E. fails to state that the sender's failure to comply with an opt-out request within 30 days is unlawful; and
> F. fails to state that a recipient's opt-out request will be effective so long as that person does not, subsequent to making such request, provide express invitation or permission to the sender, in writing or otherwise, to send such advertisements.

(Def.'s 56.1 ¶ 77; SAC ¶ 15.)  Plaintiff has initiated lawsuits prior to receiving the HMH Fax alleging each of these six violations of the TCPA's opt-out requirements. (Def.'s 56.1 ¶ 78.)

The Parties dispute whether Defendant provided a domestic contact telephone number to which the recipient may transmit an opt-out request.  (Def.'s 56.1 ¶ 85; Pl.'s 56.1 ¶ 85.)  The

HMH Fax Opt-Out Notice read as follows: "If you do not wish to receive faxes from Houghton Mifflin Harcourt in the future, and/or if you would prefer to receive communication via email, please contact your representative. Upon your request, we will remove you from our fax transmissions within 30 days." (HMH Fax.) Plaintiff correctly points out that the Opt-Out Notice itself specifically does not include a telephone numbers or communication mode through which to contact the representative. (Pl.'s 56.1 ¶ 85.) The text of the fax itself, however, includes a "1-800" fax number to which to send the fax form back to, as well as Kaczor's "1-877" telephone number and email address. (HMH Fax.)

The Parties also dispute whether Defendant provided a cost-free mechanism by which a recipient may transmit an opt-out request. (Def.'s 56.1 ¶ 88; Pl.'s 56.1 ¶ 88.) Plaintiff again points out that the Opt-Out Notice itself did not include a telephone number or communication mode through which to contact the representative. (Pl.'s 56.1 ¶ 88.) Defendant points out that the Fax included a toll-free telephone and fax number to which an opt-out could be transmitted. (Def.'s 56.1 ¶ 88.)

The Parties do not dispute whether the Opt-Out Notice "[D] state[d] that a recipient's request to opt out of future fax advertising will be effective only if the request identifies the telephone number(s) of the recipient's telephone facsimile machine(s) to which the request relates; [E] fail[ed] to state that the sender's failure to comply with an opt-out request within 30 days is unlawful; and [F] fail[ed] to state that a recipient's opt-out request will be effective so long as that person does not, subsequent to making such request, provide express invitation or permission to the sender, in writing or otherwise, to send such advertisements." (Def.'s 56.1 ¶ 77.) Having reviewed the Fax and the Opt-Out Notice, the Court notes that the Opt-Out Notice did not in fact include these aforementioned instructions and warnings.

B.  Procedural History

The procedural history of this case is extensive.  The original Complaint was filed on July 2, 2013, naming Houghton Mifflin Harcourt Publishers, Inc. ("HMH Publishers"), an entity separate from HMH, and Kaczor as Defendants.  (*See* Compl. (Dkt. No. 1).)  On July 11, 2013, Plaintiff filed a motion to certify the class and stay the decision on the motion until discovery was completed.  (*See* Dkt. Nos. 5–9.)  Those motions were terminated by the Court for failure to follow the Court's individual practices.  (*See* Dkt. No. 10.)  At a subsequent conference, the motions were reinstated, (*see* Dkt. (minute entry for Sept. 13, 2013)), but briefing was stayed pending developments in TCPA caselaw in the Second Circuit.  (*See* Dkt. No. 20.)

On August 13, 2014, Plaintiff sought leave to file a motion to amend the Complaint to add ETS as a Defendant.  (*See* Dkt. No. 44.)  On September 5, 2014, Defendants HMH Publishers and Kaczor wrote a letter to the Court seeking leave to file a motion to dismiss the case and to compel arbitration.  (*See* Dkt. No. 47.)

The Court held a pre-motion conference on October 2, 2014.  (*See* Dkt. (minute entry for Oct. 2, 2014).)  On November 2, 2014, Plaintiff filed an Amended Complaint, with the consent of HMH Publishers and Kaczor, to add HMH as a Defendant.  (*See* Am. Compl. (Dkt. No. 55).)

On November 3, 2014, HMH Publishers, HMH, and Kaczor filed a motion to compel arbitration.  (*See* Dkt. No. 56.)  The same day, Plaintiff filed a motion to amend its Amended Complaint to add ETS as a Defendant.  (*See* Dkt. No. 59.)  Oral argument on all pending motions was held on July 14, 2015.  (*See* Dkt. (minute entry for July 14, 2015).)  Thereafter, the Court granted Plaintiff's motion to amend and granted Defendants' motion to compel arbitration.  (*See* Dkt. No. 78.)

On August 5, 2015, Plaintiff filed the currently operative Second Amended Complaint, adding ETS as a Defendant. (*See* SAC.) That same day Plaintiff filed another motion for class certification, seeking certification of a subclass of individuals to whom ETS sent or caused to be sent, on or about November 15, 2012, at least one solicited or unsolicited facsimile advertisement substantially identical to the one sent to Plaintiff. (*See* Dkt. No. 81.)[15]

On October 2, 2015, after receiving an extension to respond to the SAC, ETS filed a letter motion seeking leave to file a motion to dismiss the case and also a motion to stay the case pending the Supreme Court's decisions in *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663 (2016), and *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016). (*See* Dkt. No. 96.)

On October 13, 2015, the Parties submitted, and the Court endorsed, a stipulation dismissing the Action against HMH Publishers, HMH, and Kaczor. (*See* Dkt. No. 99.) On November 13, 2015, the Parties executed a stipulation, endorsed by the Court, staying the case until the Supreme Court's decision in *Campbell-Ewald,* 136 S. Ct. 663. (*See* Dkt. No. 101.)

On February 1, 2016, ETS filed a motion to dismiss the SAC for failure to state a claim pursuant to Federal Rules of Civil Procedure 8(a) and 12(b)(6). (*See* Dkt. No. 106.) Two days later, ETS filed a letter motion requesting leave to file a Motion to allow it to deposit an amount with the Court in full satisfaction of Plaintiff's individual claim, have the Court enter judgment against ETS, and dismiss the case for lack of subject matter jurisdiction. (*See* Dkt. No. 110.) After a conference was held on March 8, 2016, ETS filed its motion to dismiss for lack of subject matter jurisdiction on March 18, 2016. (*See* Dkt. No. 127.)

---

[15] Plaintiff expressed a desire to certify other subclasses, but requested that the Court defer any decision on those Motions. Plaintiff did not brief any certification issues with respect to the remaining subclasses. (*See* Dkt. No. 81.)

On May 8, 2017, the Court denied Defendant's motions to dismiss for lack of jurisdiction and for failure to state a claim.  (*See* Opinion & Order (May 8, 2017) ("May 8, 2017 Opinion") (Dkt. No. 233).)  On May 22, 2017, ETS filed an Answer to the SAC.  (*See* Dkt. No. 234.)  On June 26, 2017, the Court informed the Parties that it would hold the motion for class certification as pending while a writ of certiorari was sought by Plaintiff in a case it was litigating in the United States Court of Appeals for the D.C. Circuit in *Bais Yaakov of Spring Valley v. FCC*, 852 F.3d 1078 (D.C. Cir. 2017).  (*See* Dkt. No. 237.)

On July 11, 2017, the Court denied without prejudice Plaintiff's motion to certify a subclass, terminated the stay in the case, and directed to parties to submit a proposed case management schedule.  (*See* Dkt. No. 240.)  The Court based its decision to deny certification on the ruling of the D.C. Circuit in *Bais Yaakov of Spring Valley*, 852 F.3d 1078, which invalidated FCC regulations that extended the disclosure requirements of the TCPA to solicited facsimile advertisements.  (*See* Dkt. No. 240.)  The Court reasoned that without the FCC mandate, there was no basis upon which to certify a subclass that included individuals who received only solicited facsimiles.  (*Id.*)

On July 19, 2017, the Court issued a Motion Scheduling Order for Defendant's Motion for Summary Judgment and held that no further discovery would take place at that time.  (*See* Dkt. No. 243.))  On August 17, 2017, Plaintiff filed a motion for reconsideration of the Court's denial of its the motion for class certification.  (Dkt. No. 244.)

On September 1, 2017, Defendant filed the present Motion for Summary Judgment, accompanying papers and exhibits, and a Rule 56.1 Statement.  (*See* Not. of Mot.; Defendant's Mem. of Law. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") (Dkt. No. 248); Def.'s 56.1; Kleinfeld Decl.)  On November 6, 2017, Plaintiff filed its Opposition to the Motion with the

accompanying memorandum of law, exhibits, and a response to Defendant's Rule 56.1 Statement. (Pl.'s Mem. in Opp'n to Mot. for Summ. J. ("Pl.'s Mem.") (Dkt. No. 263); Bellin Decl.; Pl.'s 56.1; Pl.'s 56.1 Counter.) On December 12, 2017, Defendant filed a reply and a Rule 56.1 Counterstatement. (Def.'s Reply Mem. of Law in Further Supp. of Mot. for Summ. J. ("Def.'s Reply") (Dkt. No. 275); Def.'s 56.1 Counter.)

On February 21, 2018, Defendant informed the Court that the Supreme Court denied Plaintiff's petition for writ of certiorari of the D.C. Circuit's order in *Bais Yaakov of Spring Valley*, 852 F.3d 1078. (*See* Letter from Toni-Ann Citera, Esq., to Court (Dkt. No. 284).) On June 6, 2018, the Court denied Plaintiff's motion for reconsideration of the Court's denial of the motion for class certification. (*See* Dkt. No. 294.)

Since filing their documents in support of and in opposition to the pending Motion, the Parties have submitted numerous letters alerting the Court to new authority addressing the legal questions in this case. (*See* Dkt. Nos. 290–93, 296–302.)

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the

movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; [s]he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual

issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex*, 477 U.S. at 323–24). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits . . . to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

B. Standing

1. Article III Standing

"The jurisdiction of federal courts is defined and limited by Article III of the Constitution," and "the judicial power of federal courts is constitutionally restricted to 'cases' and 'controversies.'" *Flast v. Cohen*, 392 U.S. 83, 94 (1968). "[A]t [the] uncontroverted core [of the 'case or controversy' requirement] lies the principle that, at all times, the dispute before the court must be real and live, not feigned, academic, or conjectural." *Russman v. Bd. of Educ.*, 260 F.3d 114, 118 (2d Cir. 2001). To meet that minimum constitutional threshold, Plaintiff must establish three things: "first, that [he] has sustained an injury in fact which is both concrete and particularized and actual or imminent, second, that the injury was in some sense caused by the opponent's action or omission, and finally, that a favorable resolution of the case is likely to redress the injury." *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l.*, 790 F.3d 411, 417 (2d Cir. 2015) (citations and quotation marks omitted); *see also Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982) ("[Article]

III requires the party who invokes the court's authority to show that he [or she] personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant." (quotation marks omitted)); *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 489 (2d Cir. 2009) ("[T]here are three Article III standing requirements: (1) the plaintiff must have suffered an injury-in-fact; (2) there must be a causal connection between the injury and the conduct at issue; and (3) the injury must be likely to be redressed by a favorable decision." (citation and quotation marks omitted)).

"Congress's authority to create new legal interests by statute, the invasion of which can support standing, is beyond question." *Strubel v. Comenity Bank*, 842 F.3d 181, 188 (2d Cir. 2016) (citing *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). "However, even where Congress has codified a statutory right, a plaintiff must still allege that she has suffered a concrete and particularized injury connected to that interest." *Bautz v. ARS Nat'l Servs., Inc.*, 226 F. Supp. 3d 131, 138 (E.D.N.Y. 2016) (citations omitted). "In other words, the creation of a statutory interest does not vitiate Article III's standing requirements." *Id.*

### a. Injury-in-Fact

Defendant argues that Plaintiff did not allege any actual damages, monetary or otherwise, in its SAC, that there is no evidence in the record that Plaintiff suffered any injury as a result of the receipt of the HMH Fax, (Def.'s Mem. 17–19), and, therefore, that pursuant to the Supreme Court's ruling in *Spokeo*, Plaintiff "cannot . . . satisfy the injury-in-fact requirement of Article III," 136 S. Ct. at 1549. Defendant specifically points to Sussman's testimony that he was the only person who saw the Fax, that receipt of the Fax did not disrupt work at the school, and that Plaintiff's damages were "[n]ot worth mentioning." (Def.'s Mem. 19.) Plaintiff counters that

the receipt of an unsolicited fax is a concrete injury under Article III, and that Plaintiff lost "paper, toner and time, and suffered annoyance." (Pl.'s Mem. 20–21.)

In *Spokeo*, the Supreme Court, addressing whether the plaintiff had standing to asserts a claim under the Fair Credit Reporting Act ("FCRA"), held that while "a bare procedural violation, divorced from any concrete harm, [would not] satisfy the injury-in-fact requirement of Article III," 136 S. Ct. at 1549, "the violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact . . . [and] a plaintiff in such a case need not allege any *additional* harm beyond the one Congress has identified." *Id.* The Supreme Court further held that, in passing the FCRA, Congress intended to "curb the dissemination of false information by adopting procedures designed to decrease that risk." *Id.* at 1550. The Court ultimately remanded the action to the Ninth Circuit to determine "whether the particular procedural violations alleged in th[e] case entail[ed] a degree of risk sufficient to meet the concreteness requirement." *Id.*

Recently, in *Strubel*, a case brought pursuant to the Truth In Lending Act ("TILA"), the Second Circuit applied *Spokeo* in addressing whether a plaintiff alleging mere procedural violations of TILA lacked standing. *See* 842 F.3d at 187–89. The Second Circuit clarified that *Spokeo* did not "categorically . . . preclude[] violations of statutorily mandated procedures from qualifying as concrete injuries supporting standing," *id.* at 189, but rather, "where Congress conferred [a] procedural right to protect a plaintiff's concrete interests," a court must ask whether "the procedural violation presents a 'risk of real harm' to that concrete interest," *id.* at 190 (quoting *Spokeo*, 136 S. Ct. at 1549). The Second Circuit held that TILA's "disclosure requirements . . . serve[] to protect a consumer's concrete interest in 'avoiding the uninformed use of credit,' a core object of . . . TILA" and that "[f]or that reason, a creditor's alleged violation

of each notice requirement, by itself g[ave] rise to a 'risk of real harm' to the consumer's concrete interest in the informed use of credit." *Id*. "Having alleged such procedural violations, [the plaintiff] was not required to allege any *additional* harm to demonstrate the concrete injury necessary for standing." *Id*. at 191 (quotation marks omitted); *see also Bautz*, 226 F. Supp. 3d at 138–40 (discussing *Spokeo* and *Strubel*).

"Read together, *Spokeo* and *Strubel* reaffirm the long-standing principle that Congress can recognize new interests—either tangible or intangible—through legislation and confer private rights of action to protect those interests." *Bautz*, 226 F. Supp. 3d at 140. With respect to the TCPA, "[t]he intent of Congress, when it established the TCPA in 1991, was to protect consumers from the nuisance, invasion of privacy, cost, and inconvenience that autodialed and prerecorded calls generate." *In re Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, 7979–80 (2015) ("2015 FCC Order") (citing S. Rep. No. 102-178, at 2, 4–5 (1991)).

The Second Circuit has not addressed Article III standing in the context of a TCPA fax advertisement case. However, in *Palm Beach Golf Center–Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245 (11th Cir. 2015), the Eleventh Circuit analyzed the TCPA's legislative history with respect to unsolicited fax advertisements, and concluded that it was clear that the statute's "prohibition against sending unsolicited fax advertisements was intended to protect citizens from the loss of the use of their fax machines during the transmission of fax data." *Id*. at 1252 (citation omitted). The Eleventh Circuit thus concluded that a plaintiff had standing where the defendant sent only one unsolicited fax that occupied the fax machine for only one minute, because, "[t]his occupation of [the] [p]laintiff's fax machine is among the injuries intended to be

prevented by the statute and is sufficiently personal or particularized to [the plaintiff] as to provide standing." *Id*. (citation omitted).

The Second Circuit approvingly cited *Palm Beach Golf Center–Boca* in a recent summary order in a TCPA case involving a prerecorded voicemail message, concluding that the plaintiff's receipt of the voicemail "demonstrates more than a bare violation and satisfies the concrete-injury requirement for standing," because the alleged contact was exactly the type of contact from which the TCPA was intended to protect consumers. *Leyse v. Lifetime Entm't Servs., LLC*, 679 F. App'x 44, 46 (2d Cir. 2017) (citing, *inter alia*, *Palm Beach Golf Center– Boca*, 781 F.3d at 1252). The Court recognizes that summary orders are not controlling, but notes that given the approving citation to *Palm Beach Golf Center–Boca*, it is not unlikely that the Second Circuit would reach the same conclusion as the Eleventh Circuit were it presented with the issue of standing in an unsolicited fax advertisement case. *See also Imhoff Investment, L.L.C. v. Alfoccino, Inc.*, 792 F.3d 627, 631 (6th Cir. 2015) (holding that receipt of two fax advertisement transmissions even where plaintiff did not have personal knowledge of receipt of the faxes and could not produce copies of the faxes, conferred standing on TCPA plaintiff because transmission of "junk faxes" was an actual harm the TCPA intended to protect against).

One court in the Second Circuit has expressly held in a TCPA case that the receipt of a fax constitutes concrete injury under Article III. *See Gorss Motels, Inc. v. Sysco Guest Supply, LLC*, No. 16-CV-1911, 2017 WL 3597880, at *5–6 (D. Conn. Aug. 21, 2017) (holding, in a TCPA case, that the plaintiff's receipt of the defendant's fax constituted concrete injury under Article III). Several others have held in TCPA cases that the receipt of a single call or prerecorded voicemail constitutes concrete injury under Article III. *See Melito v. Am. Eagle Outfitters, Inc.*, No. 14-CV-2440, 2017 WL 3995619, *4–5 (S.D.N.Y. Sept. 11, 2017) (holding

that receipt of prerecorded voicemail was sufficient concrete injury to give plaintiff standing), *appeal filed*, No. 17-3277 (2d Cir. 2017); *Mejia v. Time Warner Cable Inc.*, No. 15-CV-6445, 2017 WL 3278926, *6–7 (S.D.N.Y. Aug. 1, 2017) (same); *Owens v. Starion Energy, Inc.*, No. 16-CV-192, 2017 WL 2838075, at *1 n.1 (D. Conn. June 30, 2017) (holding that receipt of telemarketing call caused sufficient concrete injury under Article III to confer standing); *Zani v. Rite Aid Headquarters Corp.*, 246 F. Supp. 3d 835, 846-47 (S.D.N.Y. 2017) (same), *appeal filed*, No. 17-1230 (2d Cir. 2017); *Bell v. Survey Sampling Int'l, LLC*, No. 15-CV-1666, 2017 WL 1013294, *2–4 (D. Conn. Mar. 15, 2017) (same).

It is true that courts across the country have varied in determining whether a small number of alleged TCPA violations constitute a concrete injury. Defendant cites caselaw outside the Second Circuit for the proposition that a plaintiff who relies only on an assertion of statutory damages fails to demonstrate a concrete injury and lacks Article III standing. (Def.'s Mem. 18 (citing, *inter alia*, *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782, 796–803 (W.D. Pa. 2016) (holding the plaintiff did not suffer an "injury in fact" under TCPA where she received automated phone calls on cell phones she purchased for purpose of receiving more calls and filing TCPA lawsuits); *Sartin v. EKF Diagnostics, Inc.*, No. 16-CV-1816, 2016 WL 3598297, at *2–4 (E.D. La. July 5, 2016) (dismissing TCPA case for lack of Article III standing where the plaintiff received fax and sought only statutory damages).). However, having reviewed the caselaw, the Court finds the reasoning of the decisions from this district, and others of like mind, to be persuasive. *See, e.g.*, *Florence Endocrine Clinic, PLLC v. Arriva Medical, LLC*, 858 F.3d 1362, 1366 (11th Cir. 2017) ("Because the clinic's fax machine was occupied and rendered unavailable for legitimate business while processing the unsolicited fax, the clinic established that it suffered a concrete injury."); *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037,

1042–43 (9th Cir. 2017) (holding that recipient of unsolicited telemarketing text messages

satisfied injury-in-fact requirement for Article III standing); *Susinno v. Work Out World, Inc.*,

862 F.3d 346, 351 (3d Cir. 2017) (holding that receipt of an unsolicited call was a "concrete,

albeit intangible" injury because the injury was both one Congress intended to prevent in

enacting the TCPA and similar to privacy interests that traditional common law causes of action

sought to prevent); *Eric B. Frommer Chiropractic, Inc. v. Inovalon Holdings, Inc.*, No. 17-CV-

3801, 329 F. Supp. 3d 146, 152 (D. Md. 2018) (observing that "[t]he vast majority of courts

agree that the receipt of an unsolicited fax, sent in violation of TCPA statutory requirements,

results in a concrete injury necessary to establish Article III standing").[16]

    "In summary it is clear there exists ample case law supporting the proposition that the

TCPA has created a legally cognizable interest in protecting individuals and entities from

unwanted faxes, and that the violation of the statute creates a real and not abstract harm." *Gorss*

*Motels, Inc.*, 2017 WL 3597880, at *5 (citation and quotation marks omitted). Here, Plaintiff

received an unsolicited fax advertisement, and lost "paper, toner and time, and suffered

---

[16] On August 9, 2018, well after the Parties submitted their briefs, counsel for ETS submitted a letter to the Court alerting it to new authority related to standing under the TCPA. (*See* Letter from Sharyl A. Reisman, Esq., to Court (Dkt. No. 296).) In *St. Louis Heart Center, Inc. v. Nomax, Inc.*, 899 F.3d 500 (8th Cir. 2018), the plaintiff sued the defendant for sending plaintiff 12 fax advertisements which did not include the opt-out notices required by the TCPA. Significantly, the plaintiff conceded that it had consented to defendant sending it the fax advertisements and had in fact solicited those fax advertisements. *Id.* at 504–05. Accordingly, the Eighth Circuit concluded that that the plaintiff's claimed damages of loss of paper and toner, occupation of its phone lines, and invasion of privacy were not the result of any violation by the defendant of the TCPA's prohibition against sending unsolicited fax advertisements. *Id.* The Eighth Circuit also found that the claimed damages were not traceable to the defendant's opt-out notice violations because those damages would have occurred regardless of the content of the opt-out notices on the defendant's fax advertisements—given that the plaintiff solicited the fax advertisements. *Id.* The Court concludes that the facts here are distinguishable from *St. Louis Heart Center* because the fax advertisements here were unsolicited.

annoyance." (Pl.'s Mem. 20–21; Sussman Dep. 103.)  Under the weight of caselaw, the Court

concludes that Plaintiff suffered a concrete injury-in-fact.[17]

---

[17] The Parties spend much effort analogizing the Opt-Out Notice here to the various deficient notices found to either constitute or not constitute concrete injury in *Strubel*, 842 F.3d 181.  In *Strubel*, the plaintiff, a credit card holder, alleged that the billing rights disclosures made by the defendant bank failed to comply with TILA.  842 F.3d at 185–86.

The Second Circuit concluded that two of the plaintiff's disclosure challenges demonstrated concrete injury, specifically the required notices that certain identified consumer rights pertain only to disputed credit card purchases not yet paid in full, and a consumer dissatisfied with a credit card purchase must contact the creditor in writing or electronically. *Strubel*, 842 F.3d at 190.  The court reasoned that

> [t]hese procedures afford [] protection by requiring a creditor to notify a consumer . . . of how the consumer's own actions can affect his rights with respect to credit transactions.  A consumer who is not given notice of *his* obligations is likely not to satisfy them and, thereby, unwittingly to lose the very credit rights that the law affords him.  For that reason, a creditor's alleged violation of each notice requirement, by itself, gives rise to a "risk of real harm" to the consumer's concrete interest . . . .

*Id.* at 190-91 (quoting *Spokeo*, 136 S. Ct. at 1549) (emphasis added).

By contrast, the Second Circuit concluded that two of the plaintiff's disclosure challenges failed to demonstrate concrete injury, specifically the required notices that cardholders wishing to stop payment on an automatic payment plan had to satisfy certain obligations, and that the bank was statutorily obliged not only to acknowledge billing error claims within 30 days of receipt but also to advise of any corrections made during that time.  *Id.* at 191–94.  With respect to the automatic payment plan, the court concluded that because the bank did not offer an automatic payment plan and because plaintiff did not allege she participated in such a plan, there was "no risk of harm at all."  *Id.* at 192.

With respect to the billing error notice, the court concluded that because the plaintiff conceded that "she never had reason to report any billing error in her credit card statements . . . . she does not—and cannot—claim concrete injury."  *Id.* at 193.  The Second Circuit expressly stated, however, that it did not mean "to suggest that a consumer must have occasion to use challenged procedures to demonstrate concrete injury from defective notice."  *Id.*  Instead, the Second Circuit reasoned, "the allegedly flawed notice [did not cause the plaintiff's] credit behavior to be different from what it would have been had the credit agreement tracked the pertinent 30-day notice," and found this scenario distinguishable from the two procedural violations it concluded did present concrete injury, because there, the court could "reasonably assume that defective notices about a consumer's own obligations raise a sufficient degree of real risk that the unaware consumer will not meet those obligations."  *Id.*

Defendant argues that because Plaintiff "never even read the opt-out provision, never tried to opt out, and knew anyway how to opt out if it had wanted to," Plaintiff does not state an injury-in-fact.  (Def.'s Mem. 21.)  In particular, Defendant argues that the Opt-Out Notice here is

### b. Traceability

Defendant next argues that inasmuch as an injury exists, it is not "fairly traceable" to

Defendant's conduct because ETS and Bais Yaakov had an "established business relationship"

("EBR"), and ETS was privileged to send an unsolicited fax under a carve-out in the TCPA for

EBRs. (Def.'s Mem. 19–22.)

In addition to establishing an injury-in-fact, a plaintiff must allege that the injury "is

fairly traceable to the challenged conduct of the defendant." *Spokeo*, 136 S. Ct. at 1547. This

means that there must exist a "causal connection between the injury and the conduct complained

of" and cannot arise from an "independent action of some third party not before the court."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "The traceability requirement for

Article III standing means that the plaintiff must demonstrate a causal nexus between the

---

more akin to the two notices the Second Circuit concluded did not constitute concrete injury, because here too "(1) [Plaintiff] never tried to exercise its right under the opt-out notice, (2) the alleged defects did not alter [Plaintiff's] behavior in any way ([because] it never even read the opt-out clause and knew how to opt out anyway), and (3) there is no evidence [Defendant] failed to act as a result of the alleged notice deficiencies [as it never] denied anyone the right to opt out." (*Id*. at 22.)

Plaintiff argues that the Opt-Out Notice here is like the two deficient notices in *Strubel* that did constitute concrete injury, because Defendant did not include the specific requirements of a successful opt-out notice pursuant to 47 C.F.R. § 64.1200(a)(4)(v) in its Opt-Out Notice, and therefore there was a real risk that a recipient of the fax would fail to comply with those specific requirements, for example by not calling the specific telephone number designated for making opt-out requests. If Plaintiff failed to meet the requirements of 47 C.F.R. § 64.1200(a)(4)(v), which Defendant admittedly did not include in its Opt-Out Notice, Defendant could choose to ignore the opt-out request and continue to send unwanted fax advertisements. (Pl.'s Mem. 24–25.)

The Court finds that Plaintiff's application of *Strubel* is correct. That Plaintiff did not attempt to opt out is not outcome-determinative. The *Strubel* court made clear that "a consumer must have occasion to use challenged procedures to demonstrate concrete injury from defective notice." 842 F.3d at 193. Here, Plaintiff was "not given notice of [its] obligations [and was therefore] likely not to satisfy them." *Id*. at 191. Because the Opt-Out Notice in this case is more analogous to the deficient notices found to constitute concrete injury in *Strubel*, the Court finds that Defendant's deficient Opt-Out Notice posed a "real risk of harm" to Plaintiff's interests. *Id.* (quoting *Spokeo*, 136 S. Ct. at 1549).

defendant's conduct and the injury," and such a relationship can either be direct or indirect. *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013). The traceability requirement "ensures that there is a genuine nexus between a plaintiff's injury and a defendant's alleged . . . conduct, and is in large part designed to ensure that the injury complained of is not the result of the independent action of some third party not before the court." *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 345 (2d Cir. 2009), *rev'd on other grounds*, 564 U.S. 410 (2011).

The TCPA and its implementing regulations carve out an exemption for a sender that has an EBR with a fax recipient. 47 U.S.C. § 227(b)(1)(C); 47 C.F.R. § 64.1200(a)(4). "[A] sender that has an EBR with a consumer may send a facsimile advertisement to that consumer without obtaining separate permission from him." *In re Rules & Regs. Implementing the TCPA; Junk Fax Prevention Act of 2005*, Release No. 06-42, 21 F.C.C. Rcd. 3787, 3808 (Apr. 6, 2006) ("2006 FCC Order"). FCC regulations further state that no entity may send an unsolicited facsimile advertisement unless: (i) "[it] is from a sender with an established business relationship . . . with the recipient;" and, as relevant here, (ii) the "sender obtained the number of the telephone facsimile machine through [t]he voluntary communication of such number by the recipient . . . within the context of such established business relationship;" and (iii) "[t]he advertisement contains a notice that informs the recipient of the ability and means to avoid future unsolicited advertisements." 47 C.F.R. § 64.1200(a)(4)(i)–(iii).

The regulation states that for an opt-out notice to be effective it must "(A) [be] clear and conspicuous and on the first page of the advertisement;" (B) "state[] that the recipient may make a request to the sender of the advertisement not to send any future advertisements to a telephone facsimile machine . . . and that failure to comply, within 30 days, with such a request . . . is unlawful;" (C) "set[] forth the requirements for an opt-out request under paragraph (a)(4)(v) of

this section;" and (D) include (1) "[a] domestic contact telephone number and facsimile machine number," (2) that are either both toll-free, or some other cost-free mechanism through which the recipient can transmit the opt-out notice; and (E) the cost-free mechanisms "must permit an individual or business to make an opt-out request 24 hours a day, 7 days a week." 47 C.F.R. § 64.1200(a)(4)(iii)(A)–(E).

The regulations define an EBR in the fax context as:

> a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a business or residential subscriber with or without an exchange of consideration, on the basis of an inquiry, application, purchase or transaction by the business or residential subscriber regarding products or services offered by such person or entity, which relationship has not been previously terminated by either party.

47 C.F.R. § 64.1200(f)(6). The regulation states that for an opt-out request to be effective it must (A) "identif[y] the telephone number or numbers of the telephone facsimile machine or machines to which the request relates;" (B) "[be] made to the telephone number, facsimile number, Web site address or email address identified in the sender' facsimile advertisement;" and (C) "[t]he person making the request has not, subsequent to such request, provided express invitation or permission to the sender . . . to send such advertisements to such person at such telephone facsimile machine." 47 C.F.R. § 64.1200(a)(4)(v)(A)–(C).

ETS argues that it meets the EBR exception because the record shows that Bais Yaakov and ETS have had a continuing business relationship dating back to 1977, and that this relationship involved the purchase of ETS products and services in administering the SAT and other exams. (Def.'s Mem. 20 (citing Sussman Dep. 128–30; Def.'s 56.1 ¶¶ 62–63).) In March 2005, Bais Yaakov provided ETS its fax number via fax, and continued to do so through the start of the litigation. (*See* Def.'s 56.1 ¶¶ 64, 69–72.) Plaintiff made a payment of $494 to ETS on December 28, 2012 relating to exam administration, approximately six weeks after the HMH Fax

was sent. (*Id.* ¶ 71.) ETS argues that therefore under 47 C.F.R. § 64.1200(a)(4)(ii)(A), ETS was permitted to send faxes to Bais Yaakov. (Def.'s Mem. 21.)

Plaintiff correctly points out, however, that "an EBR does not, by itself, 'privilege' the sending of an unsolicited advertisement; the sender must satisfy two additional conditions in order to send such a fax advertisement—one of which is to include a TCPA-compliant opt-out notice, which ETS did not do." (Pl.'s Mem. 29.) While the TCPA permits a fax advertiser to send unsolicited fax advertisements when all three of the conditions in 47 C.F.R. § 64.1200(a)(4)(i)-(iii) and 47 U.S.C. § 227(b)(1)(C)(i)-(iii) are satisfied, it is not sufficient for only one of those conditions to be met. *See Bais Yaakov of Spring Valley v. Graduation Source, LLC*, No. 14-CV-3232, 2016 WL 1271693, at *2 (S.D.N.Y. Mar. 29, 2016) (holding that in additional to demonstrating an EBR, the sender must establish it "obtained the recipient's fax number either through a voluntary communication between the two" and that "the fax has an opt-out notice meeting the requirements of the statute" (citation and quotation marks omitted) (emphasis added)).

The Court concludes that ETS's Opt-Out Notice did not meet all three requirements of 47 C.F.R. § 64.1200(a)(4)(i)–(iii) because it "failed to: (1) include a statement that if the recipient requests to opt-out, failure to comply within 30 days is unlawful; or (2) explain that a request to opt-out complies with the TCPA only if (a) it identifies the telephone number of the fax machine to which the request relates; and (b) the person making the request does not, after the initial opt-out request, provide express permission for the sender to send fax advertisements." *Bais Yaakov of Spring Valley v. Alloy, Inc.*, 936 F. Supp. 2d 272, 285 (S.D.N.Y. 2013) (holding that failure to include proper opt-out notice with all of the required notifications on fax advertisement was actionable under the TCPA); *see also Gorss Motels, Inc. v. AT&T Mobility LLC*, 299 F. Supp. 3d

389, 394–95 (D. Conn. 2018) (holding that "failure to comply with the opt-out notice requirements essentially renders a fax unsolicited and therefore carries with it the same injury . . . . [and] the same concrete interests Congress sought to protect by prohibiting unsolicited fax advertisements also pertain when the opt-out language is non-compliant").  In short, ETS failed to explain in its Opt-Out Notice how to make a successful opt-out request under 47 C.F.R. § 64.1200(a)(4)(v)(A)–(C).  Because ETS did not include a proper opt-out notice, it did not satisfy the conditions of 47 C.F.R. § 64.1200(a)(4)(i)-(iii), and its sending of the unsolicited fax advertisement did not fall within the TCPA's carve-out for EBTs.

The facts that ETS's Opt-Out Notice did not contain the required language, and that the school suffered a loss of paper, ink, time, and annoyance are sufficient to show that the alleged injury, namely the receipt of the unsolicited fax, is traceable to ETS sending the fax.  *See Gorss Motels*, 2017 WL 3597880, at *7 (holding that harm of receipt of unsolicited fax by the plaintiff was fairly traceable to the defendant's sending of unsolicited fax that lacked proper opt-out notice); *see also Horton v. Sw. Med. Consulting, LLC*, No. 17-CV-0266, 2017 WL 2951922, at *5 (N.D. Okla. Jul. 10, 2017) (holding that the plaintiff showed traceability where injury resulted from the sending of unsolicited fax advertisement because "had the fax never been sent, [the] plaintiff would not have suffered these harms [lost paper, ink, toner, and time]" (quotation marks omitted)).  Accordingly, ETS's traceability argument is without merit.  Plaintiff's injury "is fairly traceable to the challenged conduct of [ETS]."  *Spokeo*, 136 S. Ct. at 1547.

## 2.  Prudential Standing

Defendant also argues that Plaintiff does not have prudential standing and falls outside the zone of interests the TCPA seeks to protect because "the TCPA was not intended to protect

opportunistic serial plaintiffs bent on shaking down corporations with frivolous claims." (Def.'s Mem. 22–23.)

"To have statutory standing a plaintiff's complaint must fall within the zone of interests protected by the law invoked." *Germain v. M&T Bank Corp*., 111 F. Supp. 3d 506, 527 (S.D.N.Y. 2015) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 125 (2014) (alterations and quotation marks omitted)). The zone of interests test "seeks to determine whether . . . the plaintiff is within the class of persons sought to be benefitted by the provision at issue." *Baisch v. Gallina*, 346 F.3d 366, 372 (2d Cir. 2003); *see also Sullivan v. Syracuse Hous. Auth*., 962 F.2d 1101, 1106 (2d Cir. 1992) ("[T]he interest asserted by the plaintiff should be arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." (citation and quotation marks omitted)).

Defendant cites *Stoops*, 197 F. Supp. 3d 782, and *Tel. Sci. Corp. v. Asset Recovery Sols., LLC*, No. 15-CV-5182, 2016 WL 4179150, *8–16 (N.D. Ill. Aug. 8, 2016), for the proposition that Plaintiff does not have prudential standing to bring its TCPA claim because it has been engaged in several other TCPA lawsuits. (Def.'s Mem. 23.) Those cases are, however, readily distinguishable. In both *Stoops* and *Telephone Science*, the courts found that the plaintiffs had set up telephone numbers for the sole purpose of receiving telephone calls upon which they might base TCPA claims. *See Stoops*, 197 F. Supp. 3d at 787–89, 805; *Telephone Science*, 2016 WL 4179150, at *1, 15–16. The court in *Stoops* concluded that it was "unfathomable that Congress considered a consumer who files TCPA actions as a business when it enacted the TCPA." 197 F. Supp. 3d at 804–06. In this case, the record is devoid of any evidence that Plaintiff set up its fax number in order to receive faxes upon which it might assert TCPA claims. To the contrary, the evidence shows that Plaintiff utilized its fax machine for business purposes

and received unsolicited fax advertisements during its course of regular business. (Sussman Dep. 24.) *See Morris v. Unitedheathcare Ins. Co.*, No. 15-CV-638, 2016 WL 7115973, at *6 (E.D. Tex. Nov. 9, 2016) (distinguishing *Stoops* and *Telephone Science* because there was "no evidence" that the plaintiff maintained its telephone number "purely for the purpose of filing TCPA lawsuits"); *Evans v. Nat'l Auto Div., L.L.C.*, No. 15-CV-8714, 2016 WL 4770033, at *3 (D.N.J. Sept. 13, 2016) (distinguishing *Stoops* because there was no evidence that the plaintiff maintained its telephone number for the purpose of filing TCPA lawsuits and further concluding that the plaintiff fell within the TCPA's zone of interests). In the absence of authority to the contrary, the Court concludes that Plaintiff's filing of other TCPA lawsuits does not remove it from the zone of interests that the TCPA was intended to protect.[18]

The TCPA's purpose is to protect individuals from telephonic and fax messages that invade their privacy. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 370–71 (2012) ("Voluminous consumer complaints about abuses of telephone technology . . . . prompted Congress to pass the TCPA."). In passing the Act, Congress was animated by "outrage[] over the proliferation" of prerecorded telemarketing calls to private residences, which consumers regarded as "an intrusive invasion of privacy" and "a nuisance." Telephone Consumer Protection Act of 1991, Pub. L. No. 102–243, §§ 2(5)–(6), (10), 105 Stat. 2394; *see also id.* §§ 2(9), (12)–(13). In passing the Act, Congress considered "[i]ndividuals' privacy rights, public safety interests, and commercial freedoms of speech and trade." *Id.* § 2(9).

Plaintiff received Defendant's unsolicited fax advertisement on the school's only fax machine, during school hours, and accordingly lost paper, toner, and time, and suffered

---

[18] The Court is mindful of the fact that Plaintiff does appear in numerous TCPA lawsuits and that it may be unlikely that Plaintiff is simply unlucky in being a purported victim of TCPA violations, but it remains the case that Plaintiff does operate as a going concern.

annoyance. (Sussman Dep. 103.)  Plaintiff suffered the kind of nuisance and invasion of privacy Congress intended to protect individuals from in passing the TCPA.  *See Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 325 (3d Cir. 2015) (holding that regular user of phone line and occupant of residence that was called was within the zone of interests protected by the TCPA, and that he had statutory standing to bring action for violations of TCPA's robocall provisions after receiving prerecorded telemarketing call on residential landline which was intended for his roommate); *Evans*, 2016 WL 4770033, at *3 (holding that "[a]s a consumer complaining of receiving intrusive telemarketing calls, [the] [p]laintiff falls directly within the zone of interests protected by the TCPA").  The Court accordingly finds that Plaintiff has prudential standing.

C.  Liability Under the TCPA

1.  The Test to Determine "Sender" Under the TCPA

The TCPA provides in pertinent part that a person or entity may not "use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement."  47 U.S.C. § 227(b)(1)(C).  The statute itself does not define the term "sender," but the FCC regulations define "sender" as "the person or entity on whose behalf a facsimile unsolicited advertisement is sent *or* whose goods or services are advertised or promoted in the unsolicited advertisement."  47 C.F.R. § 64.1200(f)(10) (emphasis added).  In a 2006 Order, the FCC further interpreted the term "sender," explaining that, "[i]n most instances, [the sender] will be the entity whose product or service is advertised or promoted in the message."  2006 FCC Order at 3808.

The Second Circuit has not yet ruled on what the appropriate approach or test is for determining the meaning of "sender" under the TCPA or for determining when a fax has been sent on behalf of a person or entity for TCPA purposes.  However, the Seventh Circuit has

applied agency law principles to determine the meaning of "sender" under the TCPA. *See Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935 (7th Cir. 2016). In *Bridgeview*, the Seventh Circuit concluded that it would not apply "strict liability" to an entity or person on whose behalf the fax was sent because this "would lead to absurd results," for example in cases where a company whose product was advertised played no role in the fax advertisement and was therefore not the "sender," but still held liable under principles of strict liability. 816 F.3d at 938 (quotation marks omitted). Instead, the Seventh Circuit held "that agency rules are properly applied to determine whether an action is done 'on behalf' of a principal." *Id.*; *see also Paldo Sign & Display Co. v. Wagener Equities, Inc*., 825 F.3d 793, 797–98 (7th Cir. 2016) (holding that agency law determines TCPA "sender" liability as articulated in *Bridgeview*). Other district courts have adopted this approach and have held that to be a "sender" under the TCPA, there must be an agency relationship such that the defendant had a meaningful role in sending the fax, and that the mere mention of its product in the fax is not enough. *See, e.g.*, *Comprehensive Health Care Sys. of Palm Beaches, Inc. v. Vitaminerals VM/Orthopedics, Ltd*., No. 16-CV-2183, 2017 WL 27263, at *5 (N.D. Ohio Jan. 3, 2017) (holding that company whose product was advertised, but which played no role in the fax advertisement, was not the sender); *Health One Med. Ctr., Eastpointe, P.L.L.C. v. Bristol-Myers Squibb Co*., No. 16-CV-13815, 2017 WL 3017521, at *3 (E.D. Mich. July 17, 2017) (holding that merely alleging that a company's "goods or services are advertised or promoted" in a fax is insufficient to state a claim that the company is a "sender" of the fax); *Helping Hand Caregivers, Ltd. v. Darden Restaurants, Inc*., No. 14-CV-10127, 2016 WL 7384458, at *5 (N.D. Ill. Dec. 21, 2016) (granting summary judgment in TCPA case where the defendant had no agency relationship with the sender); *Bais Yaakov of Spring Valley v. Varitronics, LLC*, No. 14-CV-5008, 2015 WL 1529279, at *4 (D.

Minn. Apr. 3, 2015) ("Concluding that a person or an entity is per se a 'sender' under the TCPA merely because . . . an offending fax promotes their 'goods or services' would subject parties to TCPA liability that had no involvement whatsoever in transmitting a fax advertisement."); *Cin-Q Auto., Inc. v. Buccaneers Ltd. P'ship*, No. 13-CV-1592, 2014 WL 7224943, at *6 (M.D. Fla. Dec. 17, 2014) ("Universal liability for complete inaction was not contemplated by Congress in passing the TCPA and does not appear to have been contemplated by the FCC in crafting and interpreting its regulations.").

The Sixth and Eleventh Circuits, on the other hand, have looked to a number of factors to determine whether a fax advertisement has been sent on behalf of a person or entity for TCPA purposes, including "the degree of control that the latter entity [the person on whose behalf the fax advertisements were sent] exercised over the preparation of the faxes, [and] whether the latter entity approved the final content of the faxes as broadcast." *Siding & Insulation Co. v. Alco Vending, Inc.*, 822 F.3d 886, 898 (6th Cir. 2016); *Palm Beach Golf Center–Boca*, 781 F.3d at 1257–58 (analyzing, among other things, the level of autonomy the defendant had given the person it hired to market its service and whether the fax campaign put together by that person advertised the defendant's service). Courts that have adopted this approach have sometimes found that direct liability attaches to the entity whose goods were advertised. The Sixth Circuit, for example, held, "[t]he plain language of the TCPA and the FCC's accompanying definition of 'sender' [in 47 C.F.R. § 64.1200(f)(10)] together establish that under the TCPA, direct liability attaches to the entity whose goods are advertised as opposed to the fax broadcaster," and that a plaintiff need not prove that the fax advertisement was sent "on behalf of" the defendant. *Imhoff Investment, L.L.C.*, 792 F.3d at 634–36 (denying summary judgment to defendant that had not itself sent fax advertisements, because the plaintiff had presented evidence that the defendant

"was the entity 'whose goods or service [we]re advertised or promoted in the unsolicited

advertisements,'" and was therefore a sender of the fax advertisement within the meaning of 47

C.F.R. § 64.1200(f)(10)).

The Eleventh Circuit's reasoning in *Palm Beach Golf Center–Boca* is instructive.  The

court addressed whether a person or entity whose services are advertised in an unsolicited fax,

and on whose behalf the fax is transmitted, may be held liable directly under the TCPA even

though the person did not physically transmit the fax.  781 F.3d at 1254.  The court first

considered whether *In re DISH Network, LLC*, 28 F.C.C. Rcd. 6574 (2012), a 2012 FCC

declaratory ruling, that held that an unsolicited call or text message constituted a violation of the

TCPA only by the entity or person actually transmitting the call or message, also applied to fax

transmissions.  *Id*.  The Eleventh Circuit solicited the FCC's position regarding liability for

violations of the TCPA's ban on unsolicited faxes.  "In response, the FCC submitted a letter in

which it observed that the *DISH Network* ruling applied only to liability for telemarketing calls

and neither addressed nor altered the Commission's pre-existing regulatory treatment of

unsolicited facsimile advertisements."  *Id*. at 1254–55 (citing Letter from Laurence N. Bourne,

Counsel, FCC, to John Ley, Clerk of Court, U.S. Court of Appeals for the Eleventh Circuit, 2014

WL 3734105 (July 17, 2014) ("FCC Letter").)[19]  In that letter, the FCC cited a 1995

Memorandum Opinion and Order, which stated that "the entity or entities on whose behalf

facsimiles are transmitted are ultimately liable for compliance with the rule banning unsolicited

facsimile advertisements."  (FCC Letter at 3 (quoting *In re Rules & Regs. Implementing the*

---

[19] Also in that letter, the FCC stated that principles of agency, apparent authority and ratification, which the FCC had previously ruled applied to TCPA causes of action for illegal telemarketing telephone calls and text messages, do not apply to TCPA causes of action for illegal fax advertising under 47 U.S.C. § 227(b)(1)(c) and 47 C.F.R. § 64.1200(f)(10).  *See* FCC Letter, 2014 WL 3734105, *4–5.

[*TCPA*], 10 F.C.C. Rcd. 12391, 12407 (1995) (quotation marks omitted)).) Deferring to these FCC regulations in accordance with *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984), the Eleventh Circuit concluded that the TCPA provides for direct liability for entities on whose behalf goods or services are sent. *Palm Beach Golf Center–Boca*, 781 F.3d at 1256. The court concluded on the record before it that there was "sufficient evidence for a jury to find that the . . . fax was sent on behalf of [d]efendant." *Id.* at 1257; *see Scoma Chiropractic, P.A. v. Dental Equities, LLC*, 232 F. Supp. 3d 1201, 1204–05 (M.D. Fla. 2017) (holding that a defendant that does not physically send out fax is considered sender under 47 C.F.R. § 64.1200(f)(10) if its goods or services are promoted in fax, regardless of whether the fax advertisement was sent on defendant's behalf).

At least one court in the Second Circuit has cited the multi-factor test approvingly. *Gorss Motels*, 299 F. Supp. 3d at 392 ("There are two ways in which a person or entity may qualify as a sender. First, the term sender 'means the person or entity on whose behalf a facsimile unsolicited advertisement is sent.' . . . . Second, the fax sender may be defined as the person or entity 'whose goods or services are advertised or promoted in the unsolicited advertisement.'" (quoting 47 C.F.R. § 64.1200(f)(10) and citing *Imhoff Inv., L.L.C.*, 792 F.3d at 637)).

Defendant argues that it was not a "sender" as defined by 47 C.F.R. § 64.1200(f)(10), because HMH independently conceived of and executed the fax advertisement campaign, and urges the Court to apply the agency law approach adopted by the Seventh Circuit for determining when an entity or a person is a "sender" for TCPA purposes or when a fax has been sent on behalf of a person or entity for TCPA purposes. (Def.'s Mem. 11–17.) Plaintiff argues that ETS was the "sender" for purposes of 47 C.F.R. § 64.1200(f)(10), because the fax advertisement was

sent by HMH on ETS's behalf, and urges the Court to apply the Eleventh and Sixth Circuit

Courts' approach. (Pl.'s Mem. 9–20).

The Court adopts the multi-factor analysis approach outlined by the Sixth and Eleventh

Circuits in *Siding & Insulation Co*. and *Palm Beach Golf Center–Boca* for several reasons. First,

the Seventh Circuit's decisions in *Bridgeview* did not adequately consider the letter the FCC

submitted to the Eleventh Circuit in *Palm Beach Golf Center–Boca*, specifically the portions of

the letter explaining that agency law principles were not to apply in the TCPA unsolicited fax

context. *See Bridgeview*, 816 F.3d at 938 (considering portions of the FCC letter stating that the

*Dish Network* decision was not applicable to the junk-fax context, but not the portion of the letter

expressly stating that agency law principle do not apply to the junk-fax context). The Seventh

Circuit decided to apply agency law principles in clear contradiction to the FCC letter. Because

the Eleventh and Sixth Circuit decisions were based on the FCC's interpretation of 47 C.F.R.

§ 64.1200(f)(10), and the FCC interpretation is reasonable and not plainly erroneous or

inconsistent with the plain language of the TCPA, this Court is persuaded that the Eleventh and

Sixth Circuit's approach is superior, especially because it defers to FCC interpretations of its

own regulations. *See Talk Am., Inc. v. Michigan Bell Tel. Co*., 564 U.S. 50, 59 (2011) (holding

that courts must "defer to an agency's interpretation of its regulation[], even in a legal brief,

unless the interpretation is plainly erroneous or inconsistent with the regulation' or there is any

other 'reason to suspect that the interpretation does not reflect the agency's fair and considered

judgment on the matter in question." (quotation marks omitted)); *Mullins v. City of New York*,

653 F.3d 104, 105–06, 114 (2d Cir. 2011) (deferring to interpretation of Secretary of Labor in

her amicus brief); *see also Siding*, 822 F.3d at 897 (concluding that the *Bridgeview* court's

decision to apply agency law in the fax advertisement context was "unsupported by any analysis"

and because "FCC plainly knows how to impose the standards of agency law when it wishes to do so," but chose not to do so in the fax advertisement context). In its review of TCPA caselaw and FCC regulations, the Court has found nothing to suggest that Congress or the Commission intended to impose the burden of proving the existence of an agency relationship on a plaintiff as part of proving that a fax was sent on behalf of a person or entity for TCPA purposes.

Second, the faxes at issue in *Bridgeview* were sent before the FCC amended its definition of "sender" in 47 C.F.R. § 64.1200(f)(10) to its current iteration. *See Bridgeview Health Care Center Ltd. v. Clark*, No. 09-CV-5601, 2013 WL 1154206, at *1 (N.D. Ill. Mar. 19, 2013) (describing the faxes at issue as having been sent in June 2006). Prior to August 1, 2006, the FCC definition of "sender" was limited to entities "on whose behalf facsimiles were transmitted." *In re Rules and Regulations Implementing the [TCPA]*, 10 F.C.C. Rcd. at 12407–08, ¶ 37. The language added to the definition in August 2006—"or whose goods or services are advertised or promoted in the unsolicited advertisement"—applies in this case because the Fax here was sent in 2012. *See Siding & Insulation Co.*, 822 F.3d at 886 ("Because of this expansion of liability, the 2006 definition of 'sender' did in fact change the law of TCPA liability.").[20]

The Court considers Defendant's warning that "applying a strict liability approach under the FCC's regulation would lead to absurd results and unfair enforcement of the TCPA." (Def.'s Mem. 6.) Defendant cites *Comprehensive Health Care Sys.*, 2017 WL 27263, in which the court noted that if product ownership were the only consideration, a court could find that a "vending machine company's advertisement creates TCPA liability for the soft drink companies whose

---

[20] Plaintiff argues that the Court does not have the jurisdiction to and should not strike down the second half of 47 C.F.R § 64.1200 as illogical or contrary to the TCPA. (Pl.'s Mem. 18.) Defendant does not argue that the FCC's regulations are not legally sound. The Court will not sua sponte engage in an analysis of whether any portion of the FCC regulation should be stricken.

drinks are sold in the vending machines and are promoted in the ads because the soft drink companies manufacture the drinks and benefit when customers buy their products." *Id.* at \*5. The Court does not, however, read *Siding & Insulation Co.* and *Palm Beach Golf Center–Boca* as imposing strict liability for the person or entity on whose behalf the fax advertisements are distributed. These cases merely stand for the proposition that it is not only the actual sender of the fax which can be liable under the TCPA—the entity or person behind the sender, instructing the sender, may also be liable under the TCPA—and not as a matter of strict liability, but based on an analysis of a number of factors. *See Siding & Insulation Co.*, 822 F.3d at 898 (describing the Eleventh Circuit approach as the "on-whose-behalf standard" and explaining that this approach "rejected both the strict-liability standard of 47 C.F.R. § 64.1200(f)(10) . . . and the vicarious-liability standard based on the federal common law of agency); *Palm Beach Golf Center–Boca*, 781 F.3d at 1257–58 (identifying multiple factors to consider to determine whether fax is sent "on behalf" of a defendant).

The factors include, but are not limited to, "the degree of control that [the person on whose behalf the fax advertisements were sent] exercised over the preparation of the faxes, [and] whether the . . . entity approved the final content of the faxes as broadcast," *Siding & Insulation Co.*, 822 F.3d at 898, and the level of autonomy the product's producer had given the sender, which "it hired to market defendant's service and whether the fax campaign put together by [the sender] advertised [the producer's] service," *Palm Beach Golf Center–Boca*, 781 F.3d at 1257–58. One district court has summarized the "on-whose-behalf" inquiry as follows:

> Circumstances to be considered include, but are not limited to, the degree of input and control over the content of the fax(es), the actual content of the fax(es), contractual or expressly stated limitations and scope of control between the parties, privity of the parties involved, approval of the final draft of the fax(es) and its transmission(s), method and structure of payment, overall awareness of the circumstances (including access to and control over facsimile lists and transmission

information), and the existence of measures taken to ensure compliance and/or to cure non-compliance with the TCPA.

*Cin-Q Auto., Inc.*, 2014 WL 7224943, at *7 n.1; *see also City Select Auto Sales, Inc. v. BMW Bank of N. Am. Inc.*, No. 13-CV-4595, 2015 WL 5769951, at *11 (D.N.J. Sept. 29, 2015) (citing factors such as whether the defendant entity "specifically authoriz[ed]" the transmission of the faxes or "[took] immediate action to ensure that no further [unauthorized] solicitations went out"), *vacated on other grounds* 867 F.3d 434 (3d Cir. 2017).

### 2. Application

There are several factors that tend to show that HMH did not send the Fax on ETS's behalf. ETS did not participate in generating the idea for the HMH Fax, determine the recipients and reach of the HMH fax campaign, draft the HMH Fax, engage or pay MDR and WestFax, physically send the HMH Fax, or direct any other person or entity to send the fax. (Def.'s 56.1 ¶¶ 20–30.) Indeed, the Distribution Agreement provided that HMH would "establish the marketing strategy . . . [and] develop and distribute marketing and promotional materials." (Distribution Agreement §§ 5.1(i)–(ii).) Furthermore, it is undisputed that ETS had no knowledge as to where the HMH Fax was to be sent, or even that it was actually sent out. (Def.'s 56.1 ¶¶ 41, 43.) ETS did not provide HMH with the names of any potential recipients. (*Id.* ¶ 41.) ETS received no after-the-fact reports on the HMH Fax, nor did ETS have any contact with recipients seeking to opt out. (*Id.* ¶¶ 42, 53.) One HMH employee even testified that HMH would have sent the HMH Fax even if ETS had forbidden it from doing so. (Spezzano Dep. 367–368; Def.'s 56.1 ¶ 16.)

There are, however, also several factors that tend to show that HMH did send the Fax on behalf of ETS. First, ETS expected HMH to market its Criterion Service. The Distribution Agreement provided that HMH would "use commercially reasonable efforts to promote the use

and sale of Criterion." (Distribution Agreement § 5.1.) HMH was solely responsible for signing

up new customers for ETS's Criterion Service, and for sending to ETS completed and signed

subscriber agreements, which enabled ETS to activate new customers' accounts. (Pl.'s 56.1

Counter ¶ 7.) ETS did not do its own marketing, but instead used distributors to market and sell

its product, so that ETS "ma[d]e its money" through royalties. HMH was the distributor

responsible for marketing the Criterion product. (Treves Dep. 25–26.) ETS expected HMH to

do "everything they can to effectively grow the business." (*Id*. at 34.) Second, the Distribution

Agreement provided that ETS had to approve of HMH's use of ETS logos. (Distribution

Agreement § 3.1.2.) With respect to the HMH Fax, ETS employees knew HMH was planning

on launching the fax campaign to recipients in 10 states and reviewed and approved the fax and

the use of ETS's logo. (Def.'s 56.1 ¶¶ 31, 34; Nov. 7–9 Kaczor-Yetman Emails; Nov. 7 Kaczor-

Haller Email; Nov. 12 Yetman-Haller Email.) On this point, Yetman testified that HMH "would

not have been able to send the document in the form that it was in when it was reviewed if it was

not correct as to its representation of Criterion," and that if Haller had not approved it, HMH

would have had to revise it. (Yetman Dep. 49.) Finally, the HMH Fax, on its face, promoted

ETS's Criterion Online Writing Evaluation. (HMH Fax.)

Given ample evidence to support both sides' positions, the Court concludes that the "the

question of on whose behalf the fax advertisement was sent is a question to be decided by a

jury." *Palm Beach Golf Center–Boca*, 781 F.3d at 1258. The Eleventh Circuit reached a similar

conclusion in *Palm Beach Golf Center–Boca*, where the evidence supporting the claim that the

fax was sent on behalf of the defendant included the facts that the defendant hired a marketing

manager to market its dental practice and gave him free rein to do so, that the defendant's

marketing manager contracted with a fax transmitter to initiate a fax advertisement campaign on

behalf of the dental practice, that the fax transmitter received payment from defendant and subsequently transmitted an unsolicited fax advertisement to the plaintiff, occupying its fax machine for one minute. *Id.* There was, however, also evidence that the defendant did not approve the final draft of the advertisement. *See id.* The Eleventh Circuit therefore concluded that the jury should resolve the issue. *See id.*[21]

Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in its favor, the Court is not able to conclude that no reasonable jury could find that the HMH Fax was sent on behalf of ETS. Therefore, the Court denies Defendant's Motion for Summary Judgment with respect to Plaintiff's TCPA claims.

D.  Liability Under New York's GBL § 396-aa(1)

Defendant also argues that Plaintiff's New York's GBL § 396-aa(1) claim should be dismissed because ETS did not "initiate" the HMH Fax, because Plaintiff has a long-standing business relationship with ETS, and because the claims is time barred.[22]  (Def.'s Mem. 23–25.)

---

[21] In *Siding & Insulation Co.*, the claim that the fax was sent on behalf of the defendant found support from the facts that that the defendant knew the fax transmitter had sent faxes on its behalf before and obtained customers for defendant that way, that the defendant provided information to be include in the advertisements, and that the fax advertisements promoted the defendant's services.  822 F.3d at 900–01.  Evidence that tended to show the fax was not sent on behalf of the defendant included the facts that the fax transmitter never provided the defendant any details about the list of fax numbers to which it intended to send the fax to, that the defendant never received complaints from recipients of the fax, that the fax transmitter assured the defendant that any advertisements sent would be "100 percent legal," and that the fax included a legend stating that the message was the property of the fax transmitter.  *Id.* at 899–900.  The court remanded to the district court to allow for "further discovery to determine whether, under [the "on-whose-behalf" inquiry] standard, a genuine dispute regarding any material fact exist[ed]."  *Id.* at 901.

[22] Because the Court concludes that the Parties' prior business relationship is a total defense to Plaintiff's GBL § 396 claim, it need not address Defendant's other arguments.

Notably, Plaintiff does not present a counterargument in any of its opposition filings as to why its New York State claim should survive.

GBL § 396–aa provides that it is "unlawful . . . to initiate the unsolicited transmission of telefacsimile messages promoting goods or services for purchase by the recipient of such messages," but the section "shall not apply to telefacsimile messages sent to a recipient with whom the initiator has a prior contractual or business relationship." GBL § 396–aa(1).

The Parties agree that ETS had a business relationship with Plaintiff dating from at least 1977, when Plaintiff sent ETS contact information so that ETS could update its mailing list "for the purpose of sending out testing program information which [ETS] believe[s] will be of interest to school personnel." (Def.'s 56.1 ¶ 62.) ETS's business relationship with Plaintiff was related to the school's administration of the SAT exam and other tests. (*Id.* ¶ 63.) Plaintiff made payments to ETS in connection with the purchase and sale of standardized testing services, and these payments began at least as early as November 13, 1999. (*Id.* ¶ 70.) And, Plaintiff made a payment of $494 to ETS on December 28, 2012 relating to exam administration, approximately six weeks after the HMH Fax was sent. (*Id.* ¶ 71.) The Court therefore concludes that Plaintiff and Defendant had a "prior contractual or business relationship," and that this relationship, which is not contested by the Parties, serves as a complete defense to Plaintiff's GBL § 396-aa claim. "Unlike the TCPA, GBL § 396-aa only requires 'a prior contractual or business relationship' to avoid liability under the statute." *Graduation Source, LLC*, 2016 WL 1271693, at *3 n.2; *see also Gottlieb v. Carnival Corp.*, No. 04-CV-4202, 2011 WL 7046904, at *5 (E.D.N.Y. Feb. 1, 2011) (holding that evidence of an established business relationship was a "complete defense" to GBL § 396-aa claim); *Kovel v. Lerner, Cumbo & Associates, Inc.,* 927

N.Y.S.2d 286, 288 (Sup. Ct. 2011) (affirming denial of summary judgment where there was a triable issue of fact as to whether the parties had a "prior contractual or business relationship").

Accordingly, the Court grants summary judgment to Defendant with respect to Plaintiff's GBL § 396-aa claim.

### III. Conclusion

For the foregoing reasons, the Court denies Defendant's Motion for Summary Judgment with respect to Plaintiff's TCPA claims and grants the Motion with respect to Plaintiff's New York's GBL § 396-aa claim. The Clerk of Court is respectfully directed to terminate the pending Motion. (Dkt. No. 247.) The Court will hold a Status Conference on April 24, 2019 at 11:00 a.m.

SO ORDERED.

DATED:     March 8, 2019
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE